**CITY OF MANDAN, Plaintiff and Appellee,**

v.

**Scott FERN, Defendant and Appellant.**

**Cr. No. 920274.**

Supreme Court of North Dakota.

June 16, 1993.

Benjamin C. Pulkrabek (argued), City Atty., Mandan, for plaintiff and appellee.

Thomas Dickson (argued), of Nodland & Dickson, Bismarck, for defendant and appellant.

LEVINE, Justice.

Scott Fern appeals from a county court judgment, entered upon a jury verdict, finding him guilty of driving while under the influence of alcohol. We hold that the question of whether the prosecution violat-ed the equal protection clause of the fourteenth amendment of the United States Constitution in the exercise of its peremptory challenges during jury selection must be answered by the trial court and we remand for that purpose.

On December 5, 1991, Fern was arrested in Mandan and charged with driving while under the influence of alcohol. On the day of trial, the jury panel consisted of 15 men and six women. Of the 12 persons called to the jury box for voir dire, seven were men and five were women. During selection of the six-person jury, the prosecution struck three men from the jury panel through its use of peremptory challenges. Fern objected to the prosecution's use of its peremptory challenges as being based solely on gender and, therefore, unconstitutional under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and its progeny. The trial court excused the three men from the jury panel. Fern used three peremptory challenges to strike two men and one woman from the jury panel. Each side used only three of its four allotted peremptory challenges. *See* NDRCrimP 24(b)(1). The jury, comprised of four women and two men, convicted Fern.

Fern asserts that the prosecution's use of gender-based peremptory challenges in this case violated his equal protection rights under *Batson*.[1]

---

1. When Fern challenged the prosecution's use of its peremptories, the following colloquy occurred at the bench:

 "MR. DICKSON: Under the Supreme Court case of *Batson versus Kentucky* and all the cases that have followed, the peremptory strikes exercised by the prosecution based solely upon gender are unconstitutional. At this time I'm objecting to the three strikes made by Mr. Pulkrabek. He struck Mr. Vogel, he struck Mr. Christianson and he struck Mr. Kinnischtzke.

 "THE COURT: Mr. Pulkrabek.

 "MR. PULKRABEK: My God. Usually I'm a chauvinist pig. If I knock the women off the jury, Vinje always says that prosecutors don't like any good-looking women. So if we knock the women off, then they get mad. There is no reason that I can't knock off whoever I want and it just happened to be three males in this case. If the Court is going to make a ruling we have to knock off at least one female, that's fine. I'll go on the record that I am a chauvinist pig. I would rather have an all male jury.

 "MR. DICKSON: I just wanted to make a record, Your Honor."

 The prosecution asserts that Fern waived his *Batson* objection because he did not demand a ruling by the trial court. *See, e.g., State v. Johnson*, 231 N.W.2d 180, 186 (N.D.1975) [when trial judge sustained defendant's objection but failed to rule on his request that improper testimony be stricken from record, defendant could not claim prejudice after permitting case to go to jury]. We reject this assertion. Immediately after the bench conference, the trial court informed the jury panel that "we have picked our jury for today" and the three men were excused from the jury. We believe this effectively constituted an adverse ruling on Fern's *Batson* challenge, sufficient to preserve the issue for review.

In *Batson,* the United States Supreme Court held that the equal protection clause of the fourteenth amendment prohibits a prosecutor from peremptorily striking a juror solely on the basis of race. The Court reasoned that equal protection principles forbid racially discriminatory peremptory strikes because racial discrimination during jury selection harms the excluded jurors, undermines public confidence in the judicial system and stimulates community prejudice. *Batson, supra,* 476 U.S. at 87, 106 S.Ct. at 1718.

Purposeful or deliberate exclusion of blacks from the jury on account of race through a prosecutor's use of peremptory challenges was first held to violate the equal protection clause in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). No examination of the prosecutor's reasons for the exercise of peremptory challenges in any given case was required or permitted; proof of purposeful discrimination was to be derived from examining peremptory challenges over a series of cases. *Swain, supra,* 380 U.S. at 222, 85 S.Ct. at 837. The burden was onerous. An inference of purposeful discrimination would be raised only when there was evidence that a prosecutor, "in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes ... with the result that no Negroes ever serve on petit juries...." *Swain, supra,* 380 U.S. at 223, 85 S.Ct. at 837.

In *Batson,* the Court overruled *Swain's* unforgiving evidentiary burden because it was "inconsistent with standards that have been developed since *Swain* for assessing a prima facie case under the Equal Protection Clause." *Batson, supra,* 476 U.S. at 93, 106 S.Ct. at 1721. It held that a defendant may establish a prima facie case of purposeful racial discrimination during jury selection based solely on the facts of that particular defendant's case:

"[T]he defendant first must show that he is a member of a cognizable racial group, *Castaneda v. Partida,* [430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977)], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' *Avery v. Georgia,* [345 U.S. 559, 562, 73 S.Ct. 891, 892, 97 L.Ed. 1244 (1953)]. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination." *Batson, supra,* 476 U.S. at 96, 106 S.Ct. at 1723.

Once the defendant makes a prima facie showing, the burden shifts to the prosecution to come forward and articulate a race-neutral explanation for the challenges related to the particular case to be tried. *Batson, supra,* 476 U.S. at 97–98, 106 S.Ct. at 1723–1724. A mere denial that the prosecutor had a discriminatory motive will not suffice; "the prosecutor must give a 'clear and reasonably specific' explanation of ... 'legitimate reasons' for exercising the challenges." *Batson, supra,* 476 U.S. at 98 n. 20, 106 S.Ct. at 1724 n. 20 [quoting *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981)].

 The United States Supreme Court has not ruled whether *Batson* principles extend to peremptory challenges based on gender discrimination.[2] Relying on several cases from other jurisdictions, Fern asserts

---

**2.** The United States Supreme Court recently granted certiorari in *J.E.B. v. State ex rel. T.B.,* 606 So.2d 156 (Ala.Ct.Civ.App.1992), *cert. granted,* ─ U.S. ─, 113 S.Ct. 2330, 124 L.Ed.2d 242 (1993), where the Alabama Court of Civil Ap-

peals declined to extend *Batson* principles to gender-based peremptory challenges in a civil action to establish paternity and to recover child support.

that *Batson* principles should extend to gender discrimination in the selection of a jury. We agree.[3]

There is a split in authority over whether *Batson* principles should apply to gender-based peremptory challenges. It appears that seven jurisdictions say they should. *United States v. De Gross*, 960 F.2d 1433 (9th Cir.1992); *Di Donato v. Santini*, 232 Cal.App.3d 721, 283 Cal.Rptr. 751 (1991) [state constitutional grounds]; *State v. Levinson*, 71 Haw. 492, 795 P.2d 845 (1990) [state and federal constitutional grounds]; *Tyler v. State*, 330 Md. 261, 623 A.2d 648 (1993) [state constitutional grounds]; *State v. Gonzales*, 111 N.M. 590, 808 P.2d 40 (Ct.App.1991) [state constitutional grounds]; *People v. Irizarry*, 165 A.D.2d 715, 560 N.Y.S.2d 279 (1990) [federal constitutional grounds]; and *State v. Burch*, 65 Wash.App. 828, 830 P.2d 357 (1992) [state and federal constitutional grounds].[4]

■ We find enlightened and enlightening the reasoning of the Ninth Circuit Court of Appeals in *De Gross*. Gender discrimination, like racial discrimination, stimulates community prejudice which impedes equal justice for men and women. *De Gross, supra*, 960 F.2d at 1438. Peremptory strikes based on gender, like those based on race, harm excluded jurors because discriminatory strikes bear no relationship to an individual's qualifications or ability to perform or contribute to society. *De Gross, supra*, 960 F.2d at 1439. Full community participation in the administration of the criminal justice system, whether measured by race or gender, is critical to public confidence in the system's fairness.

*Id.* The court concluded that peremptory challenges made solely upon gender, like racial challenges, are based either on the false assumption that members of a certain group are either unqualified to serve as jurors, or unable to consider impartially the case against a member or nonmember of their group. *Id.*

■ We review alleged sex discrimination under an intermediate standard of scrutiny. *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976). Under that standard, sex discrimination is not unconstitutional if it is substantially related to the achievement of important governmental objectives. *Id.* The purpose of peremptory challenges is to obtain a fair and impartial jury which is, of course, an important governmental objective. *De Gross, supra*, 960 F.2d at 1439. So, the question is whether a peremptory challenge which is grounded on a venireperson's sex is substantially related to achieving a fair and impartial jury?

■ The *De Gross* court nicely explains the difference between the legitimate peremptory strike based upon the "impression" of the lawyer and the tainted peremptory challenge based upon gender:

"But challenges explained solely by a venireperson's gender are not based on a party's sudden impression of a particular venireperson's ability to be impartial. Rather, like racial challenges, they are based either on the false assumption that members of a certain group are unqualified to serve as jurors, *Batson*, 476 U.S. at 86, 106 S.Ct. at 1717 (citing *Norris v.*

---

3. Fern hints that we should decide this issue on the basis of the equal protection provisions of our state constitution. The extent of his argument, however, is to cite Article I, Sections 21 and 22 of the North Dakota Constitution and to remind us that we may, as a matter of state constitutional law, construe our constitution to provide greater protection than that provided by the federal constitution. *See State v. Orr*, 375 N.W.2d 171, 178 n. 6 (N.D.1985). This is insufficient to raise the issue for our consideration. *See, e.g., Lund v. North Dakota State Highway Dept.*, 403 N.W.2d 25, 29 n. 6 (N.D.1987); *State v. Patzer*, 382 N.W.2d 631, 639 n. 5. (N.D.), *cert. denied*, 479 U.S. 825, 107 S.Ct. 99, 93 L.Ed.2d 50 (1986).

4. Some courts have ruled that the use of peremptory challenges by prosecutors to eliminate jurors on the basis of bias against a particular group, including gender classes, violates clauses of their respective state constitutions that guarantee a defendant the right to a trial by a jury drawn from a representative cross section of the community. *See, e.g., People v. Wheeler*, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978); *Commonwealth v. Soares*, 377 Mass. 461, 387 N.E.2d 499, *cert. denied*, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979); *State v. Gilmore*, 103 N.J. 508; 511 A.2d 1150 (1986).

*Alabama,* 294 U.S. 587, 599, 55 S.Ct. 579, 584, 79 L.Ed. 1074 (1935)), or on the false assumption that members of certain groups are unable to consider impartially the case against a member or a nonmember of their group. *Cf. Batson,* 476 U.S. at 89, 106 S.Ct. at 1719 (assumption that members of a certain group are unable to consider a case against a member of their group is false). If the decision to exclude a juror is based solely on the sex of the juror, the decision to exclude must necessarily be based on these false assumptions and does not aid in achieving an impartial jury. *See id.* at 98–99, 106 S.Ct. at 1724 (prohibiting discriminatory peremptory challenges will not undermine the contribution of peremptory challenges to the administration of justice). *Id.*

Because gender-based challenges do not aid in achieving fair and impartial juries, they are not substantially related to the governmental objective of achieving a fair and impartial jury.[5] Accordingly, gender discrimination violates not only the excluded juror's equal protection rights but also the defendant's. *De Gross, supra,* 960 F.2d at 1438. The absence of a substantial relationship between means and end makes gender- or race-based exclusions constitutionally impermissible; the presence of a substantial relationship between other grounds, like a juror's occupation, and the objective of achieving a fair and impartial jury, makes the exercise of the peremptory challenge constitutionally permissible. *De Gross, supra,* 960 F.2d at 1438 n. 8.

*Batson's* abandonment of *Swain* in race discrimination cases was undoubtedly a response to the persistence of race discrimination despite "over a century of jurisprudence dedicated to the elimination of race prejudice within the jury selection process." *Edmonson v. Leesville Concrete Co., Inc.,* —— U.S. ——, ——, 111 S.Ct. 2077, 2081–2082, 114 L.Ed.2d 660 (1991). As the Court noted in *Powers v. Ohio,* —— U.S. ——, ——, 111 S.Ct. 1364, 1366, 113 L.Ed.2d 411 (1991), "[d]espite the clarity of these commands to eliminate the taint of racial discrimination in the administration of justice, allegations of bias in the jury selection process persist."

On the other hand, recognition of gender discrimination is of much more recent vintage. Gender bias in the courtroom has only lately been acknowledged and addressed. *See* The Preliminary Report of the Ninth Circuit Gender Bias Task Force, Discussion Draft (July 1992); Gender, Justice and the Courts, Report of the Connecticut Task Force (1991); Gender and Justice in the Courts: A Report to the Supreme Court of Georgia by the Commission on Gender Bias in the Judicial System (August 1991); Report of the Select Committee on Gender Equality of the Maryland Judiciary and the Maryland State Bar Association (October 1992); Gender Bias Study of the Court System in Massachusetts (1989); Report of the New York Task Force on Wom-

---

**5.** One Note writer has persuasively argued:

"Although many studies have shown no correlation between gender and jury verdicts, there is a sizeable literature, stemming from the work of Carol Gilligan, [C. Gilligan, *In A Different Voice,* Harvard University Press (1982) ] that portrays differences in male and female approaches toward moral reasoning and problem-solving. Under this theory, women's decisionmaking is relational and contextual in contrast to men's rational approach. This suggests that women and men would behave differently as jurors. Even early proponents of women's inclusion on juries relied on perceived differences in female character to argue that women would make especially valuable jurors.

"This sharp division over the impact of gender on juries demonstrates that gender-based peremptories do not survive intermediate scrutiny under the Equal Protection Clause. At a minimum, this divergence raises serious questions about the practical wisdom of using gender as a proxy for impartiality. More importantly, if gender-based peremptories only *might* affect impartiality and this impact is questionable, they fail to meet the requirement of substantial advancement of an important state interest. Inherent in intermediate scrutiny is the notion that if state actors choose to rely on gender classifications, they must bear the burden of establishing their accuracy and validity. Given the strongly conflicting evidence surrounding this issue, the government cannot carry this burden." Note, *Beyond Batson: Eliminating Gender-Based Peremptory Challenges,* 105 Harv.L.Rev. 1920, 1933 (1992) (footnotes omitted) (emphasis in original).

en in the Courts (March 1986); Utah Task Force on Gender and Justice, Report to the Utah Judicial Council (March 1990); Wisconsin Equal Justice Task Force, Final Report (January 1991). It was not until 1971 that gender discrimination against women was first held to violate the equal protection clause of the fourteenth amendment. *See Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); L. Tribe, *American Constitutional Law* § 16–26 (2nd ed. 1988). But gender discrimination has long-standing cultural and historical roots. *See, e.g., Strauder v. West Virginia,* 100 U.S. 303, 308, 25 L.Ed. 664 (1880), *overruled by Taylor v. Louisiana,* 419 U.S. 522, 537, 95 S.Ct. 692, 701, 42 L.Ed.2d 690 (1975). Abigail Adams worried about it in her 1776 plea to her husband to "Remember the Ladies" when new laws were being created for an independent America. Paul C. Nagel, *The Adams Women,* Oxford University Press, p. 79 (1987). That gender bias continues to be a problem in general, and in jury selection, in particular, is evidenced by attorneys' all-too-prevalent reliance on myth and stereotype[6] found in manuals advising on jury selection. It has been noted that:

> "These manuals are riddled with crude stereotypes and categorical assumptions about the influence of gender. They claim, for example, that women make sympathetic jurors when children are involved, that male jurors are preferable when 'clearly demonstrated blackboard figures' are involved, and that men are 'hardboiled' and women 'emotional.' These maxims are the sort of 'role-typing' and 'archaic and overbroad' stereotypes that the Court has previously struck down when relied upon by state actors in allocating rights, benefits or burdens. In addition, the advice or 'folklore' offered by various manuals is so contradictory that its reliability is dubi-

ous." Note, *Beyond Batson: Eliminating Gender–Based Peremptory Challenges,* 105 Harv.L.Rev. 1920, 1932 (1992) (footnotes omitted).

These stereotypes remain because we do not confront their fallacy. So, women are excluded from rape-trial juries because women are harder on women, so the myth goes. Perhaps, there are women who are so inclined—because of their particularized experience, background or education. It is the role of the skilled attorney and the purpose of voir dire to search for the individual, "good" juror and eliminate the individual, "bad" one. Hunches are a legitimate tool in that pursuit—but bias, prejudice and bigotry are not. They should be subjected to wholesale deportation from our judicial system and in particular, in this case, from juror selection. *Compare* David Everett Marko, *The Case Against Gender–Based Peremptory Challenges,* 4:1 Hastings Law J. 109, 128–130 (Winter 1993). (Discrimination is intolerable. Rather than brook gender-based peremptory strikes, we should abolish peremptory challenges). Gender-based peremptory challenges are a bad remnant of the historic denial of women's rights. Sex discrimination, like race discrimination, "has no place in the courtroom."[7] *Edmonson, supra,* —— U.S. at ——, 111 S.Ct. at 2088.

We will not indulge in the fruitless endeavor of comparing the egregiousness and tragedy of race discrimination with those of gender discrimination. We are convinced, however, that there is both need and justification, similar to those that prompted the Supreme Court to step-up from *Swain* to *Batson,* to extend *Batson* principles to gender discrimination. *See Georgia v. McCollum,* —— U.S. ——, ——, 112 S.Ct. 2348, 2359, 120 L.Ed.2d 33 (1992) ["the exercise of a peremptory challenge must not be based on either the race of the

---

**6.** A stereotype is "a fixed or conventional notion or conception, as of a person, group, idea, etc., held by a number of people, and allowing for no individuality...." G. Gunther, *Forward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv.L.Rev. 1 (1972).

**7.** Neither does any other kind of gender bias, particularly, the prosecutor's expression of gender bias. *See* Footnote 1, *supra.* Canon 3B(6) of the Proposed Code of Judicial Conduct, now under consideration by this court, requires lawyers in proceedings before a judge, to refrain from manifesting any bias or prejudice.

juror or the racial stereotypes held by the party"]. Accordingly, we follow the *De Gross* court's lead and conclude that gender-based peremptory challenges violate the equal protection clause of the fourteenth amendment.

In following *De Gross*, we reject the view espoused by the Fifth Circuit Court of Appeals in *United States v. Broussard*, 987 F.2d 215 (5th Cir.1993), that gender discrimination in jury selection does not violate the equal protection clause of the fourteenth amendment.[8] The *Broussard* court rationalized that *"Batson's* move from *Swain* rested on a recognition that race lies at the core of the commands of the Fourteenth Amendment," and that race differs in significant respects from other group classifications. *Broussard, supra*, 987 F.2d at 218. The court noted that gender classes trigger only an intermediate level of scrutiny rather than the more demanding strict scrutiny which protects race as a suspect class. *Id.* The *Broussard* court criticized the *De Gross* court's justification that "full community participation" in the criminal justice system requires non-discriminatory jury selection, as "begging the essential question of 'full' participation":

> "Full participation can only mean random selection because all cannot serve. Peremptory challenges in the absence of ties across cases is part of that process of randomness. In equal protection terms, the contributions to a perception of fairness in the petit jury of peremptory challenges is an important governmental interest. *See Batson*, 476 U.S. at 98, 106 S.Ct. at 1724 (recognizing 'that the peremptory challenge occupies an important position in our trial procedures'). That interest would be frustrated by extending *Batson* to gender because it would require, on demand of counsel, an explanation for every strike. It is true

that the explanation would need to be only a non-gender rooted reason. In the real world of trials, facing an explanation for every challenge is a practical frustration of peremptories." *Broussard, supra*, 987 F.2d at 219. [Footnote omitted].

The court found no reason for the step-up from *Swain* to *Batson* in gender discrimination cases:

> "That women are not numerical minorities looms large because the focus of *Batson* is upon selecting a petit jury from a randomly chosen venire. This means that striking women, or men, for the sole reason of their sex is nigh pointless because it cannot succeed except in isolated cases.... If the bias is sex alone, its implementation is chilled by the numbers, by the reality that not only will women nonetheless be on the jury, albeit perhaps in lesser number, so also will there be jurors not wanted for other reasons left on the jury because the strikes were spent in a sexist way. Suffering the other unwanted jurors might be a payable price if determined counsel could either eliminate all women or cut their number to one or two. It is a foolish price for the bigot when the result, as in this case, would be a jury that nonetheless had a substantial number of female jurors." *Broussard, supra*, 987 F.2d at 220.

We are skeptical of the holding of the *Broussard* court, resting as it does on a fling-the-gauntlet rationale. That court says, essentially, that sex discrimination in jury selection, unlike race discrimination, will not succeed because it will not prevent members of the discriminated-against class from serving on most juries, because there are too many in that class to be totally excluded, and so, there is no justification or

---

**8.** Nine jurisdictions reject application of *Batson* to gender-based peremptory challenges. *See, e.g., United States v. Broussard*, 987 F.2d 215 (5th Cir.1993); *United States v. Nichols*, 937 F.2d 1257 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 989, 117 L.Ed.2d 151 (1992); *United States v. Hamilton*, 850 F.2d 1038 (4th Cir.1988), *cert. denied*, 493 U.S. 1069, 110 S.Ct. 1109, 107 L.Ed.2d 1017 (1990); *Daniels v. State*, 581 So.2d 536 (Ala.Ct.Crim.App.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 315, 116 L.Ed.2d 257 (1991); *Hannan v. Commonwealth*, 774 S.W.2d 462 (Ky. Ct.App.1989); *State v. Adams*, 533 So.2d 1060 (La.Ct.App.1988); *State v. Pullen*, 811 S.W.2d 463 (Mo.Ct.App.1991); *State v. Culver*, 233 Neb. 228, 444 N.W.2d 662 (1989); and *State v. Oliviera*, 534 A.2d 867 (R.I.1987).

need for extending *Batson* to gender discrimination. Ignoring for a moment the Fifth Circuit Court of Appeal's condonation of gender discrimination, we believe its holding overlooks entirely the excluded venireperson's right to equal protection. The opinion seems to denigrate the protection afforded women under the equal protection clause, questioning, as it were, their need for protection because of their numerical superiority. Constitutional law scholar John Hart Ely argues that only those who do not have access to power should be protected under the equal protection clause, not those who constitute a voting majority and have access to power. John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review,* Harvard University Press, 164–170 (1980). But regardless of Ely and others' disagreement, sex discrimination against men or women is a violation of the equal protection clause of the fourteenth amendment. *E.g., Mississippi University for Women v. Hogan,* 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *Frontiero v. Richardson,* 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). It may be speculated that the fact that women are a numerical majority with access to power influenced the Supreme Court to choose a less rigorous standard of review for gender discrimination, but it did not stop the Court from extending equal protection to women as a class.[9]

We do not share the *Broussard* court's belief that there is no need to extend *Batson* because there is "full community participation" regardless of sex discrimination because, in effect, the discriminator, ordinarily, cannot exclude every male or female venireperson. The most obvious answer to

that argument is simple. Process, not product, is the key. When the process is riddled with unfair, unseemly and unacceptable gender discrimination, it is of small moment that the process did not entirely contaminate the product. What it does contaminate is public confidence in a judicial process that condones systematic, blatant gender discrimination in the selection of juries. And rejecting *Batson* would make that conduct not only systematic, but also systemic. Institutionalizing gender bias is something we should not do until the Supreme Court of the United States clearly directs us to.

■■■ In this case, the trial court did not determine whether Fern established a prima facie case of gender discrimination and, if Fern did, the trial court did not give the prosecutor an opportunity to offer a gender-neutral explanation for the exercise of the peremptory challenges. We believe that these issues must be decided by the trial court in the first instance. *See Batson, supra,* 476 U.S. at 100, 106 S.Ct. at 1725.

■■■ Under *Batson,* the defendant establishes a prima facie case of race discrimination by first showing that the peremptory challenge was exercised against a member of a constitutionally cognizable group. Next, the defendant must demonstrate that this fact "and any other relevant circumstances raise an inference" that the prosecutor's use of the peremptory challenges was based on group membership. *Batson, supra,* 476 U.S. at 96, 106 S.Ct. at 1722–1723.

■■■ In deciding whether a prima facie case of purposeful discrimination has been established, the trial court "should consider

---

**9.** However, Justice O'Connor has refused to accept "a reading of the guarantee of equal protection under which the level of scrutiny varies according to the ability of different groups to defend their interests in the representative process." *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 495, 109 S.Ct. 706, 722, 102 L.Ed.2d 854 (1989).

One Note author has suggested that the reason strict scrutiny was not ultimately applied by the Supreme Court to gender (after a plurality in *Frontiero v. Richardson, supra,* did apply it) was

because it could not "accommodate uniformly accepted gender classifications such as single-sex bathrooms." John Galotto, Note, *Strict Scrutiny for Gender,* 93 Colum.L.Rev. 508, 521 (1993). That was so because strict scrutiny, foreordaining the result of judicial review, was "'strict in theory and fatal in fact'". *Id.,* quoting G. Gunther, The Supreme Court, 1971 Term, *Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv.L.Rev. 1, 18–19 (1972).

all relevant circumstances," including a "pattern" of peremptory challenges against members of a constitutionally cognizable group and the "prosecutor's questions and statements during *voir dire* examination." *Batson, supra,* 476 U.S. at 96–97, 106 S.Ct. at 1723.

 We reject the notion, expressed by the Fifth Circuit Court of Appeals in *Broussard,* that the use of a single peremptory challenge against a man or a woman automatically establishes a prima facie case of gender discrimination. Absent an admission of purposeful gender discrimination by the prosecution, a trial court, in determining whether the defendant has established a prima facie case, must consider all of the circumstances. We make no attempt to list all ways in which the defendant may establish a prima facie case. Instead, the trial court should consider the composition of the jury panel in relation to the composition of the jury ultimately selected; the number of peremptory challenges exercised against a particular group; the questions, statements and conduct of the prosecutor while examining the prospective jurors during voir dire; whether membership in the excluded group is the only characteristic shared by the challenged jurors; whether a pattern exists of peremptory challenges exercised against members of the group in similar cases; [10] and any other relevant circumstance that may bear on the question of purposeful discrimination. The discriminatory intent must be fairly obvious to a reasonable observer.

 If the defendant establishes a prima facie case of purposeful discrimination, the burden shifts to the prosecutor to "articulate a neutral explanation related to the particular case to be tried." *Batson, supra,* 476 U.S. at 98, 106 S.Ct. at 1724. Prospective jurors' specific responses and demeanor during voir dire may constitute neutral explanations for exercising the per-

emptory challenges. *Burch, supra,* 830 P.2d at 364. Conversely, expressions of an intention to exclude on the basis of group membership or on stereotypical assumptions about members of certain groups will not constitute a neutral explanation. *Hernandez v. New York,* —— U.S. ——, ——, 111 S.Ct. 1859, 1867, 114 L.Ed.2d 395 (1991); *Burch, supra.* In other words, the prosecutor's gender-neutral explanation must be clear and specific.

We recognize that our decision will require trial judges to make difficult and close judgments. But we endorse the California Supreme Court's response to this concern in *People v. Wheeler,* 22 Cal.3d 258, 281, 148 Cal.Rptr. 890, 906, 583 P.2d 748, 764 (1978):

> " '[Trial judges] are in good position to make such determinations, however, on the basis of their knowledge of local conditions and of local prosecutors.' ... They are also well situated to bring to bear on this question their powers of observation, their understanding of trial techniques, and their broad judicial experience. We are confident of their ability to distinguish a true case of group discrimination by peremptory challenges from a spurious claim interposed simply for purposes of harassment or delay." [Citation omitted].

 Because the trial court's findings "largely will turn on evaluation of credibility," *Batson, supra,* 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21, those findings will not be set aside on appeal unless they are clearly erroneous. *Hernandez, supra,* —— U.S. at ——, 111 S.Ct. at 1871. Accordingly, this case must be remanded to the trial court for the purpose of making the appropriate factual findings. If the trial court finds both that Fern has established a prima facie case and that the prosecutor does not have a gender-neutral explanation, it should reverse Fern's conviction and

---

10. On appeal, Fern presented statistical evidence showing the percentage of persons arrested in Morton County during 1990 and 1991 for driving while under the influence or in actual physical control who were male. He also presented statistics on peremptory challenges in

Morton County during 1992 from 19 jury trials in prosecutions for driving while under the influence. This statistical data may be considered by the trial court in determining whether Fern has established a prima facie case of purposeful discrimination.

grant a new trial. *See De Gross, supra; Di Donato, supra; Gonzales, supra; Irizarry, supra; Burch, supra.*

It is unnecessary to address the other issues raised by the parties.[11]

We remand this case for proceedings consistent with our opinion.

MESCHKE, J., concurs.

VANDE WALLE, Chief Justice, concurring specially.

I agree with Justice Levine that we should not condone gender discrimination in jury selection or elsewhere. Having said that, I am not convinced that the combination of factors in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), set forth as raising the necessary inference of purposeful discrimination, thereby establishing a prima facie case of purposeful discrimination in selection of the jury solely on evidence concerning the use of peremptory challenges, is the same for gender discrimination as it is in cases where peremptory challenges are exercised to remove from the panel members of a certain race. Every peremptory strike will necessarily involve a woman or a man. Not every peremptory strike will involve a person of a different race. I am not convinced, nor do I understand Justice Levine's opinion to necessarily hold, that the peremptory strike of one more man than woman or one more woman than man—both, I concede, members of cognizable groups subject to gender discrimination—requires, without more, any explanation from the other party. Thus the same factors which *Batson* teaches are sufficient to raise the necessary inference of purposeful racial discrimination may not be sufficient to raise an inference of gender discrimination.

The *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) procedure, although discarded in cases of race discrimination by *Batson,* may nevertheless have some application in cases of gender dis-crimination because of the inescapable fact that every peremptory exercised will be against a member of a cognizable group, i.e., women or men. If, in this case, the defense can show that the prosecution in case after case of a charge of driving while under the influence, removes men from the jury by peremptory strike, in a purposeful pattern, the burden should shift to the prosecution to articulate a gender-neutral explanation for the challenges related to the particular case to be tried. There may be other procedures which would accomplish the purpose of protecting against gender discrimination in the selection of a jury panel and preserving the system of peremptory strikes without applying *in toto* the *Batson* inferences which were designed to apply to race discrimination. I have no hesitation in concluding that gender discrimination in jury selection violates constitutional principles. I am not convinced that the *Batson* procedure is the only or the appropriate procedure to be applied to remedy that discrimination.

I am not sure what the appropriate procedure is. However, I join in remanding for a hearing on the question of whether Fern has made a prima facie showing of gender discrimination and, if so, to permit the prosecution to give, if the prosecution can, a gender-neutral explanation for the peremptory strikes exercised in this case.

SANDSTROM and NEUMANN, JJ., concur.

---

**11.** Fern also asserts that the trial court's admission in evidence of a videotape containing his refusal to submit to an intoxilyzer test violated his due process rights under the North Dakota Constitution. We decline to address the state constitutional issue because it was not raised below.